UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-cv-20855-GAYLES

**CALLAWAY MARINE
TECHNOLOGIES, INC.,**
            **Plaintiff,**

    v.

**TETRA TECH, INC., and FIDELITY &
DEPOSIT COMPANY OF MARYLAND,**
            **Defendants.**
_____/

**ORDER**

**THIS CAUSE** comes before the Court on Defendant Tetra Tech, Inc.'s ("Tetra Tech") Motion to Dismiss Count III of the Amended Complaint [ECF No. 22]. In this action, Plaintiff Callaway Marine Technologies, Inc. ("Callaway"), brings claims against Tetra Tech for breach of payment bond, breach of contract, and negligent misrepresentation arising from the performance of a construction subcontract.[1] In the instant motion, Tetra Tech seeks to dismiss the negligent misrepresentation claim contained in Count III of the Amended Complaint. The Court has carefully considered the operative complaint, the exhibits attached thereto, the parties' briefs, and the applicable law and is otherwise fully advised in the premises. Because the Court finds that Callaway has failed to allege a tort independent of the breach of contract, the motion to dismiss Count III shall be granted.

**I.    BACKGROUND**

According to the allegations in the Amended Complaint, Tetra Tech entered into a subcontract with Great Lakes Dredge & Dock Company LLC to perform a scope of work for a con-

---

[1] Callaway also brings its breach of payment bond claim against Defendant Fidelity Deposit Insurance Company of Maryland.

struction project in Miami-Dade County known as the Miami Harbor Deepening Phase 3 Project. Am. Compl. ¶ 7. On August 15, 2013, Tetra Tech entered into a subcontract with Callaway (the "Subcontract"), later executed on November 15, 2013, under which Callaway would perform a portion of Tetra Tech's subcontract work. *Id.* ¶ 9. Callaway's scope of work included placing limestone boulders (to be supplied by Tetra Tech) to build up approximately 5.57 acres of low-relief artificial reef and 3.71 acres of high-relief artificial reef. *Id.* Tetra Tech's obligations pursuant to the Subcontract included the following: supplying rock, including required shop drawings, submittals, approvals, and quality control; supplying a suitable staging area; furnishing a sufficient quantity of rock at the staging area at all times so as not to cause a delay or suspension of the work; complying with a Limestone Placement Plan that, among other items, stated that the barge will transport approximately 800 tons of rock per load; furnishing interim surveys as called for in the contract documents; and verifying or performing benthic resource surveys of the artificial reef placement areas to confirm there was no benthic hard-bottom resources inside of reef placement areas. *Id.* ¶¶ 11-12.

Callaway's scope of the rock placement was scheduled to start in the winter months of 2013, when inclement weather can make it prohibitive to work in the water on a consistent basis. So, in October 2013, the parties agreed on a schedule modification, known as "Mod 1," to the rock placement that would allow Callaway, at its option, to potentially shut down work—completely demobilizing—during winter months for weather considerations if it completed Section 1 of the project's three sections within thirty days. *Id.* ¶ 13. On or about December 24, 2013, Callaway was issued a notice to proceed and directed to begin work on Section 1, thereby commencing the thirty-day window. *Id.* ¶ 14. On December 28th, Callaway informed Tetra Tech of its plan to continuously proceed with the rock placement, and Tetra Tech responded by thanking Callaway for the update and stating that it was "look[ing] forward to the initiation and continuation of reef

construction for as long as the weather permits." *Id.* ¶ 15. Thereafter, Callaway incurred significant costs to undertake the labor of continuing the reef construction. *Id.* ¶ 16. However, as the project began, Tetra Tech had difficulty suppling sufficient rock to the staging area to allow for continuous placement of the rock, which hindered Callaway's ability to be productive on good-weather days. *Id.* ¶ 17.

Due to the weather conditions, Callaway did not complete Section 1 within thirty days, so it did not have the option to demobilize for the winter. *Id.* ¶ 18. As such, it continued with its plan to continuously place rock as long as weather permitted. *Id.* However, on February 9, 2014, Tetra Tech failed to deliver the necessary amount of rock to Callaway. *Id.* ¶ 19. On February 10th, Tetra Tech delivered more rock to the staging area; later the same day, Tetra Tech provided written notice to Callaway ceasing rock placement based on survey data until further notice from Tetra Tech. *Id.* ¶¶ 21-22. Callaway believes that a reason for Tetra Tech's directive to cease rock placement was its inability to supply sufficient quantities of rock. *Id.* ¶ 28.

On February 20, 2014—the tenth day of work stoppage—Callaway notified Tetra Tech of its intention to send the crew home and move the tug offsite to mitigate costs if work could not resume shortly thereafter. *Id.* ¶ 30. Work was not authorized to resume until seventy-six days later—on or about April 27th—and "really did not start" until June 18th, when Tetra Tech resumed delivering rock to the staging area. *Id.* ¶¶ 35-36. Around May 23rd, Callaway detected hard-bottom resources in the reef site that Tetra Tech was responsible for verifying or surveying, and went on standby as a result until June 16th. *Id.* ¶¶ 37-39. The struggle to make progress continued through September, October, and November of that year, during which Tetra Tech was again unable to supply sufficient amounts of rock to the staging area. *Id.* ¶¶ 40-41. Callaway completed demobilizing from the site on or around November 25, 2014. *Id.* ¶ 42.

Callaway filed this action on March 9, 2016, and amended its complaint on May 19th. It

3

asserts three claims against Tetra Tech: breach of payment bond, breach of contract, and negligent misrepresentation. In support of its negligent misrepresentation claim, Callaway alleges that Tetra Tech—specifically, Eric Dohner[2]—made the following four false statements of material fact to Callaway—specifically, Charles Callaway:[3]

(1) that Callaway would be allowed to place rock in the artificial reef placement areas continuously and that Callaway, at its option, could elect to fully demobilize in order to mitigate costs if it timely completed Section 1 if prolonged inclement winter weather did not efficiently, timely, and safely allow for rock placement;

(2) that Tetra Tech would supply sufficient quantity of rock per day since Callaway was required to furnish a barge capable of transporting 800 tons of rock per load;

(3) that Tetra Tech understood the methodology for how rocks would be surveyed for the designated high-relief reef locations and low-relief reef locations; and

(4) that Tetra Tech verified or had performed all surveys required to ensure the protection of benthic resources in the artificial reef placement areas.

*Id.* ¶ 62. Callaway alleges that Tetra Tech knew these representations were false, made the misrepresentations without knowledge of their truth or falsity, or should have known the representations were false because (1) Tetra Tech did not allow Callaway to continuously place rock and instead unilaterally, unreasonably, and arbitrarily ceased rock placement because it did not understand survey data and could not furnish sufficient rock; (2) Tetra Tech never furnished sufficient quantities of rock notwithstanding Callaway furnishing a barge capable of transporting approxi-

---

[2] The Amended Complaint contains no information about Eric Dohner other than his name; it is silent about his relationship to Tetra Tech. Through a review of the exhibits attached to the Complaint, however, the Court found email correspondence from Dohner sent during the relevant time period in which he identifies himself as "Director, Resource Management" of Tetra Tech. *See* Am. Compl. Ex. C at 1.

[3] The Amended Complaint also contains no information about Charles Callaway other than his name, and is similarly silent about his relationship to Callaway Marine Technologies, Inc. The Court was able to find email correspondence from Charles Callaway sent during the relevant time period in which he identifies himself as the president of Callaway Marine Technologies, Inc. *See* Am. Compl. Ex. C at 3.

mately 800 tons of rock per load; and (3) Tetra Tech did not verify or have performed the Benthic Mapping Survey since work had to stop due to concerns over locations where rock was designated to be placed. *Id.* ¶ 63.

Tetra Tech filed the instant motion to dismiss the negligent misrepresentation claim on June 8, 2016. It advances three principal arguments in favor of dismissal: first, that Callaway failed to allege a tort independent of the alleged breach of contract; second, that Callaway's reliance on the alleged misrepresentations, if any, was unreasonable; and third, that Callaway has failed to plead negligent misrepresentation with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. Callaway opposes the motion.

## II.     LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff, *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). At bottom, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

5

**III.    DISCUSSION**

Tetra Tech argues that Callaway's negligent misrepresentation claim is barred under Florida's "independent tort rule." In its claim, Callaway alleges that Tetra Tech breached a duty in tort by making statements that Tetra Tech either knew were false, was without knowledge of their truth or falsity, or should have known were false. That said, Callaway and Tetra Tech were in contractual privity by virtue of the Subcontract between them that gives rise to this action.

Recently, in *Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013), the Florida Supreme Court limited the application of the economic loss rule, "a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses," to only cases involving products liability. In other words, *Tiara* instructs that courts should no longer consider the economic loss rule in cases where the parties are in contractual privity, such as the case here. However, in a concurring opinion to the *Tiara* decision, Justice Pariente explained:

> Basic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies, and . . . our clarification of the economic loss rule's applicability does nothing to alter these common law concepts. For example, in order to bring a valid tort claim, a party must still demonstrate that all of the required elements for the cause of action are satisfied, including that the tort is independent of any independent breach of contract.

*Tiara*, 110 So. 3d at 408 (Pariente, J., concurring). In the wake of *Tiara*, the Eleventh Circuit noted that "[w]hile the exact contours of this possible separate limitation, as applied post-*Tiara*, are still unclear, the standard appears to be that 'where a breach of contract is combined with some other conduct amounting to an independent tort, the breach can be considered negligence.'" *Lamm v. State St. Bank & Trust*, 749 F.3d 938, 947 (11th Cir. 2014) (quoting *U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc.*, 134 So. 3d 477, 480 (Fla. 2d DCA 2013)). Courts in this District have continually followed the interpretation of *Tiara* suggested by the Eleventh Circuit in *Lamm*. *See, e.g.*, *Burdick*

*v. Bank of Am., N.A.*, 99 F. Supp. 2d 1372, 1378 ("[T]he alleged duty [element of a negligence claim] cannot stem from a contractual relationship between the parties. . . . To bring a negligence claim under Florida law, a party must demonstrate that 'the tort is independent of any breach of contract claim.'" (quoting *Tiara*, 110 So. 3d at 408 (Pariente, J., concurring))); *Kaye v. Ingenio, Filale de Loto-Que., Inc.*, No. 13-61687, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014) ("[T]o set forth a claim in tort between parties in contractual privity, a party must allege action beyond and independent of breach of contract that amounts to an independent tort."); *Altenel, Inc. v. Millennium Partners, L.L.C.*, 947 F. Supp. 2d 1357, 1369 (S.D. Fla. 2013) ("While the economic loss doctrine may no longer apply outside the product liability context, Justice Pariente's concurring opinion in the *Tiara Condominium Association* case makes clear that the ruling does not disturb the landscape of contract law . . . .").

In *Kaye*, for instance, the plaintiff assigned all rights, title, and interest in his patents for a new method of playing interactive lottery games to the defendant company, Ingenio, which in turn licensed the patents back to an entity owned by the plaintiff. 2014 WL 2215770 at *1. The license agreement gave the plaintiff the right to prosecute all infringements of the patents if Ingenio decided not to do so itself. *Id.* However, when widespread infringement was discovered and the plaintiff sought to prosecute the suspected infringers, Ingenio began making "allegedly preposterous demands" so as to block the plaintiff from bringing his claims. *Id.* at *2-3. The plaintiff filed suit bringing claims including fraud in the inducement, alleging that Ingenio never intended the plaintiff or his companies to exercise their right to pursue infringers. *Id.* at *3. In dismissing the plaintiff's fraudulent inducement claim as barred by the independent tort rule, then–District Judge Rosenbaum explained that "the fact that the economic-loss rule [no longer applies] to cases where the parties are in contractual privity does not mean that parties in contractual privity may recast causes of action that are otherwise breach-of-contract claims as tort claims." *Id.* at *4. She

7

found that the fraudulent misrepresentation alleged by the plaintiff (that Ingenio would allow him to prosecute infringers) was a right "specifically embodied" in the parties' license agreement. *Id.* at *5. Based on that, she concluded that the plaintiff had not alleged action beyond breach of contract and amounting to an independent tort, because "[w]hile the initial promise may have been fraudulent, the terms of the purported fraud were memorialized in the License Agreement. As a result, any failure to comply with those terms results in an action for breach of contract." *Id.*

The Court is persuaded by the analysis in *Kaye*. Callaway has, like the plaintiff in *Kaye*, failed to allege conduct that is independent of a breach of contract amounting to an independent tort. Each of the allegedly fraudulent statements advanced by Tetra Tech touches on subject matters that were later reduced to writing in the Subcontract.

First, the project's construction schedule (and proposed modifications thereto) is memorialized in Exhibit E of the Subcontract, *see* Am. Compl. ¶ 13; *see also* Am. Compl. Ex. B at 52, so Tetra Tech's alleged failure to abide by that schedule is a breach of contract, not an independent tort. Thus, the alleged fraudulent statement by Tetra Tech ***concerning*** the construction schedule—which was later memorialized in the Subcontract—does not give rise to a cause of action sounding in tort.

Second, article 4, section 8 of the Subcontract delineates Callaway's avenue for recourse in the event Tetra Tech "fail[ed] to procure and supply sufficient rock to the staging area [if] this failure impacts [Callaway]'s ability to meet the scheduling requirements of the project." *See* Am. Compl. Ex. B. at 4. Callaway alleges in its breach of contract claim that Tetra Tech "materially breached the Subcontract through its failure to perform its contractual obligations," including its obligation to procure and supply sufficient rock. Am. Compl. ¶ 55. Tetra Tech's statement in advance of the execution of the Subcontract, that it "would supply sufficient quantity of rock," *id.*

8

¶ 62—again, the precise promise later memorialized in the Subcontract—is not conduct independent of the alleged breach of the Subcontract.

Third, Exhibit A of the Subcontract provided for interim surveys of both high-relief and low-relief reef locations by Tetra Tech. *See* Am. Compl. Ex. B at 11. If Tetra Tech somehow misunderstood the methodology of those surveys, and that misunderstanding resulted in damage to Callaway, Callaway's proper recourse lies in breach of contract, not tort. Tetra Tech's alleged pre-contractual statement that it *did* understand the survey methodologies is not conduct independent of a breach.

And fourth, Callaway alleges that Tetra Tech was required by the Subcontract to "verify and/or have performed benthic resource surveys of the artificial reef placement areas to confirm there was no benthic hard-bottom resources inside of reef placement areas." Am. Compl. ¶ 12. Callaway also alleges that Tetra Tech "materially breached the Subcontract" by failing to perform this obligation. *Id.* ¶ 55. Tetra Tech's allegedly fraudulent statement that it "verified or had performed all surveys required to ensure the protection of benthic resources in the artificial reef placement areas," *id.* ¶ 62, is also not conduct independent of the alleged breach of contract, but rather merely a statement that was eventually reduced to a contractual obligation.

Callaway's contention that the fact that pre-contractual statements were made necessarily transforms those statements into actions independent of the contract is a nonstarter. *See, e.g.*, *B&G Aventura, LLC v. G-Side Ltd. P'ship*, 97 So. 3d 308, 309-10 (Fla. 3d DCA 2012) (concluding that a plaintiff's fraudulent inducement claim "fails as a matter of law because the alleged oral misrepresentations are adequately covered or expressly contradicted in a later written contract" (quoting *Hillcrest Pac. Corp. v. Yamamura*, 727 So. 2d 1053, 1056 (Fla. 4th DCA 1999))). Callaway's position, in essence, is that Tetra Tech stated it could perform the duties later memorialized in the Subcontract and then did not perform those duties. As *Kaye* makes clear, alleging an independent tort

9

requires allegations "beyond *and* independent of breach of contract." 2014 WL 2215770, at *4 (emphasis added). Callaway's arguments are not sufficient to circumvent the independent tort rule—if they were, negligent misrepresentation claims would simply collapse into breach of contract claims, as the allegations giving rise to both claims would be identical.

The Court finds that because the purported pre-contract negligent misrepresentations were each incorporated into the Subcontract (as acknowledged by Callaway), Callaway has not alleged tortious conduct beyond and independent of the alleged breach of the Subcontract. Accordingly, Callaway's negligent misrepresentation claims are, therefore, barred under the independent tort rule.[4]

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that the Defendant's Partial Motion to Dismiss [ECF No. 22] is **GRANTED**. Count III of the Amended Complaint [ECF No. 13] is **DISMISSED WITH PREJUDICE**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of December, 2016.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

---

[4] Given that the Court's conclusion on this issue is dispositive of the instant motion, it need not address any of Tetra Tech's other arguments in favor of dismissal.